**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 24-cr-00127 (RBW)** |
| | : | |
| **RODNEY BAGGOTT,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its Attorney, the United States Attorney for the District of Columbia, hereby submits this memorandum in aid of sentencing. The Defendant, Rodney Baggott, is before the Court having been found guilty by a jury of First-Degree Murder While Armed with Aggravating Circumstances, Possession of a Firearm During a Crime of Violence or Dangerous Offence and two counts of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year. Considering the Defendant's prior Voluntary Manslaughter conviction, the United States respectfully requests that the Court enter a finding that aggravating circumstances exist and sentence the Defendant to life imprisonment without release on Count One of the Indictment. The United States also requests that the Court sentence the Defendant to concurrent sentences of 180 months (15 years) for his convictions on Counts Three and Seven for Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year. Finally, the United States requests that the Court sentence the Defendant to 180 months (15 years) of incarceration for Possession of a Firearm During a Crime of Violence, to run concurrent to other sentences. In support of its recommendation, the United States relies on the following points and authorities, and any other such points and authorities that it may cite at a hearing.

1

## BACKGROUND

Having presided over the trial, the Court is familiar with the facts of this case.  In summary, the Defendant shot 27-year-old Rasheek Abdullah around 4:00 PM on January 30, 2024, as both men were driving their respective vehicles near Dupont Circle.

The evidence showed that as Mr. Abdullah turned right onto Q Street NW, Washington, D.C., he moved into an open lane to avoid a parked Metrobus.  In doing so, Mr. Abdullah took over a lane of traffic in front of the Defendant, and Mr. Abdullah proceeded in front of the Defendant in the lane of traffic.  The Defendant, driving a white Mitsubishi Outlander, had just picked up his then-girlfriend from her job at a law firm in Dupont Circle.  As the Court observed at trial, the surveillance video showed the white Mitsubishi Outlander had distinctive damage to its right front side.  A surveillance camera on a Metrobus parked on Q Street NW captured the incident.

Initially, the Defendant was driving in the left lane. When Mr. Abdullah drove in front of him, the Defendant moved into the right lane on Q Street next to Mr. Abdullah's car, and rolled down his window—despite having a green light.  After what appeared to be a very brief exchange of words, the Defendant pulled out a gun, reached his arm out the window, and fired a single shot at Mr. Abdullah.

The bullet entered Mr. Abdullah's neck, fracturing several vertebrae and immediately paralyzing him. A doctor on scene, as well as police and other first responders, provided Mr. Abdullah with emergency medical care until he was transported to George Washington University Hospital.  There, Mr. Abdullah underwent emergency surgery to stabilize his neck because, as the surgeon testified, Mr. Abdullah's head was essentially not connected to the rest of his body because of the gunshot wound.

Law enforcement recovered a single 9mm Luger cartridge casing from the scene. An ATF firearms expert later linked that casing to a gun found in a bag the Defendant residence. The Defendant was also linked to the murder weapon through DNA testing.

Almost immediately after responding to the scene for the shooting, law enforcement obtained surveillance video and looked for a white SUV with distinctive damage on the right front side. That same day, law enforcement put out a "BOLO" for the vehicle, noting the damage to the front passenger fender and bumper.

The Defendant was aware of this damage and the prospect that law enforcement would be able to identify him as the culprit because of it. While still fleeing the scene in the White Mitsubishi, evidence showed that the cell phone belonging to the Defendant's then-girlfriend contacted an auto body shop in D.C. Two days later, the Defendant took the vehicle to the body shop for repair. A text messages exchange between the Defendant and his then-girlfriend's phone contained a link to a news article about the shooting with surveillance video connecting their car to the shooting.

Through surveillance video and insurance records, law enforcement linked the white Mitsubishi Outlander to the Defendant's girlfriend. In addition to the surveillance video of the Defendant's car, cell site location data, and vehicle telematics put the Defendant and his white Mitsubishi Outlander in the immediate vicinity of the shooting.

About a month later, on Saturday, March 2, 2024, an officer with the Montgomery County Police Department in Maryland observed white Mitsubishi Outlander outside a restaurant in Silver Spring, Maryland, and stopped the Defendant. The white Mitsubishi Outlander had a "felony vehicle" notice based on the January 30, 2024, shooting. The Defendant was in the driver's seat when contacted. In plain view, an officer found a black Stoeger STR-9C handgun in the driver's

side door. This gun was not the one used in the January 30th shooting and no evidence of it was introduced at trial.

Later that night, law enforcement obtained a search warrant for the Defendant's apartment in the District of Columbia. During the search, in a bag with men's clothing and documents bearing the Defendant's name, law enforcement found the murder weapon—a black Intra-Tec 9mm semi-automatic pistol with one round in the chamber and 9 rounds in the magazine.  The ammunition in the gun was the same caliber and headstamp—WIN 9mm Luger—as the shell casing found at the murder scene, which was later linked through forensic testing to the shell casing from the shooting.

As a result of the shooting, Mr. Abdullah's health declined until his death. He became a quadriplegic from the moment the Defendant shot him. From there, his condition deteriorated over a three-month period until his death on April 29, 2024.

For this conduct, on January 30, 2024, a D.C. jury convicted the Defendant of all counts charged against him:  First Degree Murder While Armed (Premeditated) with Aggravating Circumstances, in violation of D.C. Code Ann. § 22-2101, 4502, (Count 1),  Possession of a Firearm During a Crime of Violence or Dangerous Offense, in violation of 22 D.C. Code, Section 4504(b) (Count 2),  and two counts of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of Title 18, United States Code, Section 922(g)(1) (Counts 3, and 7).

Pursuant to D.C. Code Ann. § 22-2101, 4502, the mandatory minimum sentence for First Degree Murder While Armed (Premeditated) without aggravating circumstances is 30 years of imprisonment with a maximum sentence of 60 years of imprisonment.  If, as discussed below, the Court finds the existence of aggravating circumstances beyond a reasonable doubt, the Defendant is eligible for a sentence of more than 60 years and up to life, D.C. Code Ann. § 22-2104.01(c)

(West).    Possession of a Firearm During a Crime of Violence carries a mandatory minimum sentence of five years of incarceration and a maximum sentence of 15 years of incarceration pursuant to D.C. Code Ann. § 22-4504(b) (West).  The maximum term of imprisonment is 15 years for Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, 18 U.S.C.A. § 922(g)(1) (West) and 924(a)(8).

## LEGAL PRINCIPLES

### 1.  Aggravating Circumstances

In this case, the Defendant was charged by Superseding Indictment, that included the fact that at the time the murder was committed in this case, the Defendant had been previously convicted and sentenced for Voluntary Manslaughter While Armed in Case Number 2015-CF1-013244 in the Superior Court of the District of Columbia.  *See* Superseding Indictment, 5/30/24 at ECF 15.   In addition to the statutory citation for First Degree Murder While Armed, the Superseding Indictment included the applicable sentencing enhancement, D.C. Code 22-2104.01(b)(12).  That law titled, Sentencing Procedure for Murder in the First Degree, provides:

> (a) If a defendant is convicted of murder in the first degree, and if the prosecution has given the notice required under § 22-2104(a), a separate sentencing procedure shall be conducted as soon as practicable after the trial has been completed to determine whether to impose a sentence of more than 60 years up to, and including, life imprisonment without possibility of release.
> (b) In determining the sentence, a finding shall be made whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:
> …
> (12) At the time of the commission of the murder, the defendant had previously been convicted and sentenced, whether in a court of the District of Columbia, of the United States, or of any state, for (A) murder, (B) manslaughter, …
> (c) The finding shall state in writing whether, beyond a reasonable doubt, 1 or more of the aggravating circumstances exist. If 1 or more aggravating circumstances exist, a sentence of more than 60 years up to, and including, life imprisonment without release may be imposed.

The Government gave formal written notice of intent to seek the enhancement on June 16, 2025[1]. Also, on March 21, 2025, the Government asserted that "the fact of this conviction for voluntary manslaughter while armed in D.C. Superior Court case 2015-CF1-013244 is direct evidence necessary to prove this Aggravating Circumstance to the jury." Government's Omnibus Pretrial Motions and Notice of Intent to Admit Evidence Under Rule 404(b) and to Impeach under Rule 609, ECF No. 37 at p. 7. The Defense responded, "If Mr. Baggott is convicted by a jury of first-degree murder, the fact of his prior conviction will not be disputed by the defense." *See* Mr. Baggott's Opposition to the Governments Motion, ECF 42, filed 4/4/25 at p. 5. Further, the Defense conceded, "[t]he government need not introduce evidence of the prior manslaughter at trial to prove the sentencing enhancement." Id.

2. *Sentencing Factors*

When determining the appropriate sentence, the District Court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). See *Gall v. United States*, 552 U.S. 38, 49–50, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007). Indeed, the United States Sentencing Commission Guidelines ("Guidelines") themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 551 U.S. 338, 348–50, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007). Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant

---

[1] The government acknowledges that formal notice was filed 29 days before the empanelment of the jury and the commencement of trial.

with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Consequently, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a District Court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 552 U.S. at 49 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 349; s*ee also* U.S. Sent'g Comm'n Supp. Rep. on the Initial Guidelines & Pol'y Statements at 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study District Court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (noting that the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## THE DEFENDANT'S GUIDELINES CALCULATION

The Government concurs that the DC Guidelines range for Counts 1 and 2 is 360+ months and 84+ months respectively. PSR ¶ at 141-142. The Government also agrees with the PSR that the total combined offense level under the USSG is 43. PSR ¶ 41. With respect to Counts 3 and 7, the statutorily authorized maximum sentence is 180 months, and therefore the Defendant's sentencing range on those Counts under the USSG, is 180 months. PSR ¶¶ 144-145.

## SENTENCING RECOMMENDATION

Pursuant to the sentencing procedure[2] outlined by D.C. Code Ann. § 22-2104.01, the Government asks this Court to find beyond a reasonable doubt that at the time of the commission of the murder in this case, the Defendant had previously been convicted and sentenced for manslaughter. The Government offers the attached Judgment in Superior Court Case number 2015 CF1 013244, attached hereto as Exhibit One.

Upon this finding, the Government respectfully recommends that Defendant be sentenced to life imprisonment without release on Count One of the Indictment, Murder in the First Degree While Armed in violation of D.C. Code Ann. §§ 22-2101, 4502. On Count Two, Possession of a

---

[2] "[T]here is no indication that this 'separate sentencing procedure' differs from the sentencing procedure, separate from trial, commonly conducted in Superior Court…" *Parker v. United States*, 692 A.2d 913, 917 (D.C. 1997).

Firearm During a Crime of Violence in violation of D.C. Code Ann. § 22-4504, the United States requests that the Court sentence the Defendant to 180 months (15 years) of incarceration for Possession of a Firearm During a Crime of Violence in violation of D.C. Code Ann. § 22-4504, to run concurrent to the other counts. The United States also recommends that the Court sentence the Defendant to of 180 months (15 years) for his convictions on Counts Three and Seven for Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, to be run concurrent with the other counts.

1. *The Nature and Circumstances of the Offense*

The Defendant's conduct in this case represents a shocking and inexplicable disregard for rules of civil society and the value of human life. The Defendant brazenly pulled out a pistol and shot a complete stranger as they sat in adjacent cars at a busy intersection in Dupont Circle after a completely commonplace, everyday traffic interaction. He did so in broad daylight and in the presence of many other innocent people, who just like the victim, were going about their daily lives. The Defendant committed this crime using a firearm he knew he was not lawfully permitted to possess based on his numerous felony convictions, and while on supervised release following a prison sentence for killing another person with a firearm. This conduct is nothing less than egregious, and there is no reason to give him the benefit of any mitigation or to countenance it in any way. After the crime, the Defendant actively avoided apprehension and went about with his life until he was finally apprehended, leaving a restaurant with his romantic partner, in possession of another illegal firearm.

As the Defendant went on with his life, the victim in this case, Mr. Abdullah, suffered immensely. For nearly three months, because of the Defendant's callous actions the victim was paralyzed from the neck down, bedridden and essentially wasting away. After initially undergoing

surgery to stabilize his neck with metal screws and brackets, he suffered and endured numerous other medical interventions related to loss of organ function and pneumonia. Mr. Abdullah was moved between various facilities, including George Washington University Hospital, Bridgepoint Hospital for long term care, and then to Washington Hospital Center on February 27, 2024. Ultimately, about a month after his 28th birthday, Mr. Abdullah suffered cardiac arrest and a severe loss of oxygen to his brain culminating in his death on April 29, 2024. The Defendant stole Mr. Abdullah's life from him before he had really begun living it.

2. *The History and Characteristics of the Defendant*

The Defendant is a 58-year-old man with a criminal record stretching back over 40 years – his entire adult life. PSR ¶ 46-55. All told, the Defendant has a long criminal history with 10 prior criminal convictions, arising from 40 separate arrests or incidents. PSR ¶ 46-89. It is more than clear that despite an overwhelming number of interventions by the legal system, the Defendant has not been, and will not be, able to conform his conduct to the confines of the law.

The Defendant has six prior convictions for drug related offenses, including possession and trafficking, involving various controlled substances. He also has multiple prior convictions related to firearms, including Firearm During Drug Trafficking in Prince George's County Maryland in 1992 and Carrying a Pistol Without a License in Washington, DC in 1992, and perhaps most notably, Voluntary Manslaughter While Armed in Washington, DC in 2019. *Id*. At ¶ 49, 50 and 55.

As a result of his convictions, the Defendant has been repeatedly incarcerated throughout his life. Based on the PSR, the Defendant has received numerous carceral sentences ranging from

time served up to 10 years, amounting to approximately 24 years of time[3], and appears to have spent more of his adult life incarcerated than not.  PSR ¶ 46-55.

It is also worth noting that although he was not convicted, the Defendant was previously charged in two additional homicide cases involving weapons in Washington, DC: first in 1993 (1993 FEL 009228) and in 2016 (2016 CF1 018419).  The former case, based on the court docket, appears to have been a co-defendant matter, where the Defendant was acquitted and the co-defendant was convicted following a jury trial.  The latter case, though charged in 2016, related to a slaying in 1995, that was ultimately dismissed pursuant to the Defendant's guilty plea in 2015 CF1 013244.

### 3. The Need for the Sentence Imposed

As the statute calls for, the sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense.  *See* 18 U.S.C.A. § 3553(a)(2) (West).  A sentence of life incarceration without release accomplishes all these ends.  Although no punishment is sufficient to compensate for the anguish suffered by Mr. Abdullah and his family, a life sentence without release reflects the gravity of his actions and the profound need to isolate the Defendant from the community for the remainder of his life.  With respect to general deterrence, the swift and certain punishment called for by D.C. Code Ann. § 22-2104.01, life imprisonment, will serve as general deterrence for those who, like the Defendant, have previously been convicted and sentenced for manslaughter and go on to commit first degree murder.

Finally, the Defendant has shown that he is both unable and unwilling to abide by the law and social contracts that are essential to a peaceful and civilized society.  He has proven to be a

---

[3] This accounts for the sentencing data contained in the PSR and does not consider any pretrial detention in connection with any unadjudicated matters or acquitted conduct, suspended sentences, or revocations of release.

danger to our community time and time again, and a lifetime of incarceration ensures that the danger he poses to our community is neutralized.  As such, a sentence of life without release satisfies the sentencing guidelines and sentencing factors pursuant to 18 U.S.C.A. § 3553(a).

For the reasons stated, the United States requests this Court sentence the Defendant to the life imprisonment without release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _____

Daniel T. Seidel
Assistant United States Attorney
CO Bar No. 41521
601 D Street, N.W., Room 3.120
Washington, D.C.  20530
(202) 252-7619
daniel.seidel@usdoj.gov

# EXHIBIT ONE

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **United States of America**<br>Vs.<br><br>**RODNEY EUGENE BAGGOTT**<br>DOB:01/03/1968 | **JUDGMENT IN A CRIMINAL CASE**<br>**(Incarceration)**<br><br>Case No. **2015 CF1 013244**<br>PDID No. **384959**<br>DCDC No. **231086** |

**THE DEFENDANT HAVING BEEN FOUND GUILTY ON THE FOLLOWING COUNT(S) AS INDICATED BELOW:**

| Count | Court Finding | Charge |
|---|---|---|
| 1 | Found Guilty - Plea | Voluntary Manslaughter While Armed |

## SENTENCE OF THE COURT

**Count 1 Voluntary Manslaughter While Armed** Sentenced to 8 year(s) incarceration, Followed by 5 year(s) supervised release., $100.00 VVCA, VVCA Due Date 04/30/2027

Credit for Time Served The sentence to run concurrent to any sentence imposed in the supervised release/parole case 1997 FEL 4419

A TRUE COPY
TEST: MAR 10 2026

Clerk, Superior Court of
the District of Columbia

By _____
Deputy Clerk

The defendant is hereby committed to the custody of the Attorney General to be incarcerated for a total term of
**8 years** . MANDATORY MINIMUM term of _____ applies.

Upon release from incarceration, the Defendant shall be on supervised release for a term of: **5 years**
The Court makes the following recommendations to the Bureau of Prisons/Department of Corrections:
Court recommends placement as close to Washington D.C. as possible with college course opportunities

Total costs in the aggregate amount of $ **100.00** have been assessed under the Victims of Violent Crime Compensation
Act of 1996, and ☐ have ☑ have not been paid. ☐ Appeal rights given ☐ Gun Offender Registry Order Issued
☐ Advised of right to file a Motion to Suspend Child Support Order ☐ Sex Offender Registration Notice Given
☐ Domestic violence notice given prohibiting possession/purchase of firearm or ammunition
☐ Restitution is part of the sentence and judgment pursuant to D.C. Code § 16-711. ☐ Voluntary Surrender

| | |
|---|---|
| ____4/30/2019____<br>Date | _____<br>JUDITH BARTNOFF<br>Judge |
| Certification by Clerk pursuant to Criminal Rule 32(d) | |
| ____4/30/2019____<br>Date | _____<br>Michelle Henson<br>Deputy Clerk |

Received by DUSM: ___Knutson___ Badge#: _3103_ Signature: _____ Date: 4/30/19 Time: 1230
Printed Name

Case: 2015 CF1 013244

CDJC_Jail.doc